# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF RHODE ISLAND

METROPOLITAN LIFE INSURANCE
COMPANY,
    Plaintiff,

v.                                    C.A. No. 07-427ML

PAUL M. DRAINVILLE, JR.,
STEPHANIE M. DRAINVILLE,
and LAURA DRAINVILLE,
    Defendants,

_____

PAUL M. DRAINVILLE, JR.,
STEPHANIE M. DRAINVILLE,
    Cross-Claim Plaintiffs,

v.

LAURA DRAINVILLE,
    Cross-Claim Defendant,

_____

PAUL M. DRAINVILLE, JR.,
STEPHANIE M. DRAINVILLE,
    Third-Party Plaintiffs,

v.

THE ESTATE OF PAUL M. DRAINVILLE, SR.,
by and through its EXECUTRIX,
LAURA DRAINVILLE,
    Third-Party Defendant.

## ORDER AND MEMORANDUM

Mary M. Lisi, Chief United States District Court Judge.

The question before this Court is whether a property settlement agreement that was incorporated, but not merged, into a final divorce decree constitutes a valid qualified domestic

1

relations order ("QDRO"). Because this Court, under the circumstances presented in this case, answers the question in the affirmative, it finds that the QDRO at issue qualifies as an exemption to ERISA's general prohibition against assignment or alienation of an employee benefit plan. Accordingly, the cross-claim plaintiffs' motion for partial summary judgment with respect to their declaratory judgment claim is GRANTED.

## I. Facts and Travel of the Case

The marriage between Paul M. Drainville Sr. ("Paul Sr.") and Pamela Drainville ("Pamela") formally ended in 1991. Pursuant to a property settlement agreement (the "Agreement"), Paul Sr. and Pamela agreed to maintain their children Paul Jr. and Stephanie (together, the "Siblings") as equal beneficiaries of the parties' respective life insurance policies until Stephanie turned 22, on July 8, 2011. Specifically, Paragraph 3.4 of the Agreement provided:

> Until the youngest child's 22nd birthday, the parties shall each maintain the children as primary beneficiaries (in equal shares) of each party's life insurance which is currently provided through each party's employment by New England Telephone Company. The face amount of the coverage currently is three times each party's annual earnings; and the parties shall maintain that level of coverage so long as the employer provides it as an employment benefit.

The Agreement also provided that each parent was to contribute to each child's reasonable college tuition and expenses, "to the extent of each parent's ability to pay at the time the

2

expense must be incurred." Agreement ¶ 3.5. The Agreement was incorporated, but not merged, into the final divorce decree.

Subsequently, Paul Sr.'s employer, New England Telephone Company, underwent a series of mergers until it emerged as Verizon. Metropolitan Life Insurance Company ("MetLife") served as the claim fiduciary of the Verizon Plan for Group Insurance (the "Verizon Plan"), which is an employee welfare benefit plan subject to ERISA. Paul Sr. participated in the Verizon Plan, electing Basic Life Insurance Coverage worth $10,000 and Optional Coverage of two times his annual salary.

At some point in time, Paul Sr. married Laura Drainville ("Laura") and the couple moved to Florida. On May 7, 2001, Paul Sr. executed a beneficiary form that designated Laura as the primary beneficiary of his Life Insurance Policy (the "Policy") and Paul Jr. and Stephanie as "alternate" beneficiaries. On June 29, 2001, Paul Sr. sought permission from the Rhode Island Family Court to cancel his life insurance requirement under the Agreement, on the ground that he was no longer employed and coverage was no longer available to him as an employee benefit. Counsel for Pamela objected, asserting that Paul Sr. voluntarily terminated his employment - apparently, Paul Sr. had retired. After a hearing, Paul Sr.'s request was denied by order of the Family Court, which set forth that "[p]aragraph 3.4 of the parties' Property Settlement Agreement entered into on November 22, 1991 is hereby confirmed by

3

the Court and ratified as being in full force and effect." Family Court Order entered August 18, 2001. No appeal was taken from this order.

On June 15, 2007, Paul Sr. died and payment under the Policy became due. The combined amount totaled $174,000, which was less than three times Paul Sr.'s annual earnings. Laura filed a claim for the Policy proceeds with MetLife on August 6, 2007. Pamela also asserted a claim for payment under the Policy on August 13, 2007, and she requested that MetLife review Paragraph 3.4 of the Agreement regarding maintenance of Paul Jr. and Stephanie as beneficiaries. On August 29, 2007, MetLife informed Laura and the Siblings of the competing claims it had received. Paul Jr. and Stephanie filed an action against MetLife in Rhode Island state court on October 29, 2007 and Laura filed a claim against MetLife in Federal District Court in Florida on October 30, 2007. Faced with lawsuits in two jurisdictions, MetLife filed an interpleader action in this Court on November 11, 2007 and deposited the Policy proceeds with the Court's registry.

In response to MetLife's complaint in interpleader, Paul Jr. and Stephanie asserted certain cross-claims against Laura for Unjust Enrichment/Constructive Trust, Tortious Interference, Conversion, and Declaratory Judgment. In connection with the first three claims, the Siblings suggested that, upon Paul Sr.'s death, Laura received all of his real and personal assets and that such

assets should be made available to pay for a portion of Stephanie's education[1], and to make up for the shortfall in life insurance coverage required under the Agreement. The fourth claim sought a declaration that the Agreement constitutes a QDRO under ERISA, and that the Siblings are entitled to full payment under the Policy. It is with respect to the fourth claim that Paul Jr. and Stephanie seek partial summary judgment at this time.

Together with her objection to the Siblings' motion, Laura submitted a copy of Verizon's QDRO Procedures, which is currently subject to Paul Jr.'s and Stephanie's motion to strike on the ground that it is irrelevant and has not been properly authenticated. Laura's subsequent motion for an extension of time to submit an authenticated copy has since been denied by this Court.

## II. Standard of Review

In order to grant summary judgment, the Court must find that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009). The initial burden is on the moving party to show the absence of genuine issues of material fact, after which "the

---

[1] The Siblings assert that neither Paul Sr. nor his widow contributed to Stephanie's college tuition and expenses. Second Amended Cross-Claim ¶ 60.

5

nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir. 2005). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008)(citation and internal quotation marks omitted). A material fact "has the potential of determining the outcome of the litigation." Maymi v. Puerto Rico Ports Authority, 515 F.3d 20, 25 (1st Cir. 2008).

### III. Discussion

(A) Qualified Domestic Relations Orders

The "anti-alienation" or "spendthrift" clause of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1056(d)(1) sets forth that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." The intent of this "anti-alienation" clause is to "secure the financial well-being of employees and their dependents." Ablamis v. Roper, 937 F.2d 1450, 1454 (9th Cir. 1991). Congress, in passing the Retirement Equity Act of 1984 ("REA"), Pub. L. No. 98-397 § 303(d), 98 Stat. 1426, amended ERISA in order to "afford better protection to women 'dependent on . . . [their] husband[s'] earnings." Ablamis v. Roper, 937 F.2d at 1453-54 ("REA amended ERISA in an effort primarily to safeguard the financial security of

widows and divorcees"); <u>Boggs v. Boggs</u>, 520 U.S. 833, 847, 117 S.Ct. 1754, 1763, 138 L.Ed.2d 45 (1997) (one of REA's central purposes is "to give enhanced protection to the spouse and dependent children in the event of divorce and separation"). The result was "an express statutory exception to the prohibition on assignment and alienation in the case of distributions made pursuant to certain state court orders: ERISA's spendthrift provisions are not applicable to a 'qualified domestic relations order.'" <u>Ablamis</u> at 1454; <u>Barrs v. Lockheed Martin Corp.</u>, 287 F.3d 202, 208 (1st Cir. 2002)(Under REA, QDROs are "exempted from the general preemption section that has been the basis of court rulings broadly preempting state-law assignments of benefits").

Section 1056(d) of Title 29 states as follows:

> (3)(A) Paragraph (1) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order. 29 U.S.C. § 1056(d)(3)(A).

A "domestic relations order" is defined as "any judgment, decree, or order (including approval of a property settlement agreement) which (1) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and (2) is made pursuant to a State domestic relations law (including a community

7

property law)'. 29 U.S.C. § 1056(d)(3)(B)(i)(I), (II).

Only <u>qualified</u> domestic relations orders, or "QDROs," are eligible for an exemption under ERISA's general anti-alienation provision. <u>Geiger v. Foley Hoag, LLP</u>, 521 F.3d 60, 62 (1st Cir. 2008)(Benefits provided under an ERISA plan "may not be assigned or alienated" by a domestic relations order, unless that order "is determined to be a" QDRO)(citation and internal quotation marks omitted). In order to be deemed "qualified," a domestic relations order must clearly specify (1) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order; (2) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined; (3) the number of payments or period to which such order applies; and (4) each plan to which such order applies. 29 U.S.C. § 1056(d)(3)(C)(i)-(iv).[2]

(B) The Parties' Contentions

Laura, to whom Paul Sr. assigned the proceeds under the Policy, asserts that the Agreement neither "is" nor "constitutes" a QDRO. Specifically, she argues that the Agreement was never filed with any of Paul Sr.'s employers or provided to the plan

---

[2] The statute also lists three conditions that preclude a domestic relations order from qualifying for the ERISA exemption, which are not applicable in this case. 29 U.S.C. §1056(d)(3)(C)(i)-(iii).

administrator and that Paul Jr. and Stephanie failed to "perfect their rights by having the Property Settlement and Separation Agreement approved as a QDRO." Laura's Mem. ¶15. Laura also suggests that the Policy was "supplemental" because, at the time of his death, Paul Sr. had retired from Verizon and the purchase of life insurance coverage was no longer available to him as a benefit of his employment. Finally, Laura points to "General QDRO Requirements" contained in Verizon's QDRO Procedures Manual to demonstrate that the Agreement is insufficient to constitute a QDRO.

On their part, Paul Jr. and Stephanie maintain that their parents' final divorce decree, which incorporated the Agreement by reference, is a QDRO that fulfills all the requirements set forth in Section 1056(d). Cross-Claim Plaintiffs' Mem. 4. The Siblings rely on case law to support their assertion that a domestic relations order qualifies under ERISA, as long as it adequately provides the information required under the statute. Id. at 6-8.

In addition, Paul Jr. and Stephanie seek reasonable attorneys' fees and costs based on a provision in the Agreement which, in the event of a breach, holds a breaching party liable for such expenses. Id. at 13.

(C) The Agreement

The "Family Court Final Judgment," entered on February 25, 1992, provides that the Agreement "is approved by the Court and

9

shall be incorporated in its Judgment, but not merged therein."[3]

Based on the plain language of Section 1056(d) "the term 'domestic relations order' means any judgment, decree, or order (including approval of a property settlement)." There is no requirement that the property settlement be merged into the final divorce decree. Other courts have held that a property settlement agreement that was incorporated, not merged, into a final judgment pursuant to state domestic relations law, constitutes a domestic relations order. See e.g., Carland v. Metropolitan Life Ins. Co., 935 F.2d 1114 (10th Cir. 1991)(divorce decree requiring payment of life insurance benefits to ex-wife qualified for exemption to ERISA anti-alienation clause); Metropolitan Life Ins. Co., v. Marsh, 119 F.3d 415 (6th Cir. 1997)(divorce decree which incorporated property settlement agreement awarding portion of life insurance proceeds to children constituted QDRO).

The divorce decree in this case, by explicitly incorporating the terms of the Property Settlement Agreement, specifically addresses the provision of "child support, alimony payments, or marital property rights" to Pamela and the Siblings. The decree constituted a final judgment by the Family Court and was issued pursuant to Rhode Island state domestic relations law. See 29

---

[3] A property settlement agreement which is incorporated, but not merged, into the final decree of divorce, retains the characteristics of a contract. As such, it can be modified only if both parties consent to the modification. Gorman v. Gorman, 883 A.2d 732, 740 (R.I. 2005).

U.S.C. § 1056(d)(B)(ii). As such, it clearly constitutes a "domestic relations order."

However, in order to qualify for exemption under ERISA, the decree must also clearly specify certain information intended to simplify the process of benefit determination by plan administrators. See <u>Metropolitan Life Ins. Co. v. Wheaton</u>, 42 F.3d 1080 (7th Cir. 1994)(Specificity in domestic relations order required to avoid risk of faulty plan administration).

First, the domestic relations order must include "the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order." 29 U.S.C. § 1056(d)(3)(C)(i). The Agreement, although it includes the required names, does not provide any mailing addresses beyond the town and state where Pamela and Paul Sr., respectively, resided in 1991. As both children were minors at that time and physical custody was awarded to Pamela, Paul Jr. and Stephanie's address would have been that of their mother. Both Pamela and Paul Sr. continued their employment with Verizon and Verizon appears to have had no difficulty corresponding with the parties. Under these circumstances, the lack of a mailing address is not fatal to the qualification of the order. See, e.g. <u>Metropolitan Life Ins. Co. v. Bigelow</u>, 283 F.3d 436, 444 ("order will not be treated as failing to be a qualified order merely because the order does not specify the current mailing address of the participant and

alternate payee if the plan administrator has reason to know that address independently of the order")(quoting S.Rep. No. 98-575 at 20 (1984), reprinted in 1984 U.S.C.C.A.N. 2547, 2566).

Second, the order must specify "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined." 29 U.S.C. § 1056(d)(3)(C)(ii). Subsection 3.4 of the Agreement provides that Paul Jr. and Stephanie shall be maintained as the primary beneficiaries under the Policy "in equal shares." As such, the provision of how the proceeds are to be divided is unambiguous.

Third, the order must state "the number of payments or period to which such order applies." 29 U.S.C. § 1056(d)(3)(C)(iii). Paragraph 3 of the Agreement states that Paul Sr. and Pamela had two children, Paul Jr., born on September 5, 1975, and Stephanie, born on July 8, 1989. Paragraph 3.4 provides that the parties shall continue to maintain life insurance coverage as specified "[u]ntil the youngest child's 22nd birthday." Consequently, with respect to the requirement to provide life insurance benefits, the order applies until July 8, 2011.

Finally, the order must clearly specify "each plan to which such order applies." 29 U.S.C. § 1056(d)(3)(C)(iv). Paragraph 3.4 refers to "each party's life insurance which is currently provided through each party's employment by New England Telephone Company"

and specifies the face amount of coverage as "three times each party's annual earnings." In this respect, too, the Agreement appears to be sufficiently specific, and there has been no assertion that the Policy at issue in this litigation is different from the plan provided by Paul Sr.'s employer at the time of the Agreement.

Based on the foregoing, the divorce decree in this case meets all the requirements of 29 U.S.C. § 1056(d)(3)(C)(i)-(iv), and constitutes a QDRO, which serves as the basis for assigning the proceeds of the Policy to the Siblings, as set forth in the Agreement. Consequently, Paul Jr. and Stephanie are entitled as a matter of law to a declaratory judgment; their partial motion for summary judgment with respect to Count IV of their cross-claim is GRANTED.

With respect to the Verizon QDRO procedures which Laura repeatedly sought to submit to this Court, the motion to strike is GRANTED. There is nothing in Section 1056 that indicates a domestic relations order must comply, beyond the requirements of the statute, with procedures set by an employer in order to constitute a QDRO. Therefore, this Court need not consider such procedures. However, even if this Court were inclined to consider the submitted document, a review of the 11 requirements specified therein reveals no obstacle to qualifying the divorce decree as a QDRO. Requirements 1 through 3 simply paraphrase the definition of

a "domestic relations order" provided by Subsection 1056(3)(B), which applies to the divorce decree in this case. Requirements 4, 5, 6, and 8 restate the qualifications of a QDRO, which have also been met by the divorce decree. (The Verizon document notes that the requirement of the Social Security number and date of birth of the participant and alternate payee is "not a legal requirement," but necessary for benefit processing). Requirements 7, 9, and 10 relate to certain disqualifying conditions which are not at issue in this case. (See n. 2, herein).

Requirement 11 states that a domestic relations order must "[b]e approved by the Plan Administrator" and references ERISA 206(d)(3)(G)(i)(II), which provides that "[i]n the case of any domestic relations order received by a plan . . . within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination." 29 U.S.C. § 1056(d)(3)(G)(i)(II). This requirement imposes a duty on the plan administrator to review a submitted domestic relations order after he receives it; it is not, by itself, a qualifying condition. In addition, the provision contains no requirement that a domestic relations order must be received prior to the death of the participant.

In sum, the proffered Verizon procedures, even if they were

deemed applicable to the divorce decree in this case, do not preclude the decree from qualifying as a QDRO.

(D) Attorneys' Fees and Costs

In their motion for partial summary judgment, Paul Jr. and Stephanie request "reimbursement of reasonable attorneys' fees and costs connected to this litigation" pursuant to the terms of the Agreement. Paragraph 7.7 of the Agreement states that "[i]n the event of a breach of this Agreement, the <u>breaching party</u> shall be liable for all costs and expenses reasonably necessary to the enforcement of the terms of this Agreement, including reasonable attorneys' fees." (Emphasis added). The Siblings' request merits no lengthy discussion. Laura is not, and never has been, a party to the Agreement, and cannot be held personally liable for any expenses incurred in an action to enforce the Agreement. To the extent that Paul Jr. and Stephanie's cross-claim asserts a breach of the Agreement by their father, such breach has not been conclusively established at this time, and the motion for attorneys' fees is premature. Therefore, the request for attorneys' fees is denied.

## Conclusion

For the reasons stated herein, the cross-claim plaintiffs' motion for partial summary judgment with respect to their claim for declaratory judgment is GRANTED; and the request for payment of reasonable attorneys' fees and cost of this litigation is DENIED.

15

SO ORDERED:

_Mary M. Lisi_
Mary M. Lisi
Chief United States District Judge
Date: July 23, 2009